We're here this morning on the limited issue of whether we should issue a stay of the District Court's order dissolving the injunction pending a hearing on the merits of the plaintiff's appeal from the District Court's earlier summary judgment order. So I guess we will hear from Ms. Hapner first on that question. And in particular, Ms. Hapner, my question is under McKeown. In order to issue such a stay, there needs to be a strong showing of a likelihood of success on the merits. And I guess in my personal view, that's to me the key element that's important to be determined today. Okay. This is Rebecca Smith appearing for the appellant Sharon J. Hapner, Native Ecosystems Council and the Alliance for the Wild Rockies. And I understand that I have 15 minutes today, is that correct? Yes, that's correct. Okay. And I'd like to reserve three minutes then for a rebuttal. All right. Well, you're going to have to watch your time because we do not have a clock. Do you have one? I have a stopwatch. Oh, okay. Okay. We'll watch your time for you. Okay. It's starting to run now. Okay. Go ahead. Before I address the issues of likelihood of success on the merits, there are two key facts that I would like to draw to the court's attention. The first key fact is that the Smith Creek Project area is still suffering from a legacy of unremediated ecological damage from past logging operations and past road building and road use. And the second key fact is that the Forest Service has completely failed to provide an analysis of elk hiding cover according to the Gallatin Forest Plan definition. I will focus today on the likelihood of success on the merits. And so first I would like to address the Forest Service's failure to comply with the elk hiding cover standard. Then I will address the Forest Service's failure to comply with the soil quality standards. Third, the failure to monitor indicator species populations. And fourth, the failure to maintain cutthroat trout habitat. Regarding the first legal issue, the elk hiding cover analysis, it's undisputed that this area, this project area, is used by elk. It's undisputed that the Gallatin Forest Plan does require that two-thirds hiding cover for elk be maintained. And it also appears to be undisputed that the Forest Service has never actually calculated hiding cover in the project area according to the Forest Plan definition of elk hiding cover. And so this court addressed an almost identical issue in Native Ecosystems Council versus U.S. Forest Service, which was a 2005 case. And notably, that case and this case both involved one of the same appellants, the Native Ecosystems Council, and one of the same defendant appellees, the U.S. Forest Service. The only real distinction between that decision, that case, and the incident case is that it was a different national forest in Montana about an hour away from the project area in this case. In that first Native Ecosystems Council's case, this court... Can I interrupt you for a minute on this elk hiding... I would tend to think that your elk hiding cover argument is probably your strongest argument. But the service says that it does comply with the two-third requirement under two types of analyses. So are you quarreling with the methods that they've analyzed the cover? Are you saying they're considering some things as cover that are not exactly cover under the way you would define it or the plan would define it? Yes, Your Honor. The Forest Service analyzed hiding cover in several different ways with several different definitions. But the one definition that it didn't use was the legally binding definition, which is in the Gallatin Forest Plan. In the Native Ecosystems Council case, this court said that the Forest Service has to comply with its own forest plan to comply with the National Forest Management Act. Well, let me... I guess I have... This is Judge Berzon. Similar to Judge Warthoff in this regard. First of all, I'm not... I think that your contention of noncompliance relates both to the percentage and also to how they determined whether there was cover. Is that right? That's correct, Your Honor. So the first question is the forest plan says 67%. And it seems to be a dispute, I think, about 67% of what? Reading your briefs and the district court's order, my sense is that there is a confusion about whether we're talking about 67% of what was there before or 67% of the project area or 67% of the forest as a whole. What are we talking about? What do you think we're talking about? Your Honor, I believe that the forest plan requires the maintenance of two-thirds of a project area in hiding cover because if there is any other interpretation, if in fact it was only two-thirds of the preexisting amount, then the Forest Service could continually log down to almost nothing. If it only had to maintain two-thirds of what was existing eventually... You have to say something like two-thirds of what was historically there. That's what it seems. That's what it most clearly seems to say, although I don't know how you figure out what that is. Does that not... What is the exact language? I believe the exact language just says maintain two-thirds hiding cover. I think... No, there's more than that. I'll find it. Go ahead with your argument. The other question is how do you figure out when you can see an elk from 200 feet or cover 90% of an elk from 200 feet? How do you do that? Your Honor, that's an important question and one that appellants believe that the Forest Service needs to answer in the first instance in the administrative proceedings. There does appear to be some ability of the Forest Service to determine hiding cover based on that definition because if we look at the Helena National Forest, in their forest plan, they did do a comparison of hiding cover analyzed under the Forest Service definition versus hiding cover analyzed under the Montana Fish, Wildlife, and Parks definition. That comparison showed that, in fact, hiding cover under the Forest Service definition is significantly lower than if the same area is analyzed under the Montana Fish, Wildlife, and Parks definition. That comparison in the Helena National Forest is Exhibit 12 to appellant's motion. By looking at that exhibit and that excerpt of the Helena National Forest, we can tell that there is some way that the agency can determine hiding cover based on that definition. What the plan actually says is two-thirds of the hiding cover associated with key habitat components over time. Not the clearest sentence in the world, but I took it to mean some historical comparison. Your Honor, that's a good question and that's not one that has ever really been clearly answered as to what, obviously, it hasn't been clearly answered as to what the area is that we're basing hiding cover off of, but the Forest Service itself interpreted that provision to mean 66% of an area. That was the general interpretation throughout the administrative proceedings. This is Judge Fischer. Could I ask a further clarifying question? It talks, there's a forest cover and there's canopy cover. Are we talking about visibility from above the canopy, or I assume we're talking about visibility if one is standing within the forest itself? Your Honor, that is a critical distinction. That is the critical distinction between the Forest Service definition and the Montana definition, actually, because the Montana definition, which looks at canopy cover, would be from looking down from an aerial view, versus the Forest Service definition, which when you read it, it implies that you're on the ground looking straight into the forest. The fact that there are two definitions and that one is the legally binding Forest Service definition, but that's not the definition that was assessed in this case is why we can't tell, why it's impossible to tell whether or not the Forest Service has complied with the hiding cover standard. Even if we did, could come to a mutually agreeable conclusion on two-thirds of what, we still don't know how much hiding cover there even is, because the Forest Service has never assessed hiding cover according to the forest land definition. This is really just like this court's opinion in the first Native Ecosystems Council case. I have one other question, and that is Judge Malloy on this case was also the judge in Helena Hunter and Angler's, which I guess was decided end of July and addressed this very issue with respect to a different project. He found the flaws that you were arguing here, at least in some respects, if not entirely. Mike, I'm curious as to whether the issue that you're pressing before us now was presented to Judge Malloy in this case, since he seems to understand what the issue is, seems to have come to a conclusion sympathetic to your position in a different case, but doesn't seem to have done so here. Yes, Your Honor, and the reason there was some confusion on this, I believe, is because we did have a case where the decision was permanently enjoined and remanded to the Forest Service, and then the Forest Service issued a new decision that reaffirmed the old decision, and so the second lawsuit that was, the second complaint filed in this case, specifically addressed the failure to assess hiding cover under the Forest Service definition, and then when the briefing happened again before the District Court, Judge Malloy declined to go back and reconsider any of the arguments on elk hiding cover from his original opinion, and he did address the failure to use the Forest Service definition in a very cursory fashion. He simply said that in the Helena Hunter and Angler's case, that case was dealing with the Helena National Forest, and in this case, we're dealing with the Gallatin National Forest, and he said, and therefore they have different standards, and so those cases aren't applicable, and he didn't actually assess whether the differences in the forest plan standards are to this issue. Is it, I gather there's a difference percentage, and it might be a percentage of something else, but the definitions are the same, is that right? Your Honor. I'm sorry? That's correct, Your Honor. I should just let you know that you're approaching 12 minutes of used time, so you're running into a three-minute warning. Okay. If there's no further questions, I would like to reserve my remaining time for rebundal then. All right. Okay. May it please the Court, this is Brian Toth for the United States, Your Honors. I want to emphasize at the outset that this is a proceeding for an extraordinary remedy and that there are four separate independent requirements that the plaintiffs have to demonstrate that they have a clear showing that they're entitled to a stay or an injunction, however you want to view it here. We don't think that they've met those four independent requirements. In particular, we don't think they've met the irreparable injury requirement, and I want to put that irreparable injury requirement in the context of the elk issue. The record shows that elk are doing very well in the hunting district that intersects the project area. The exhibits BB and II to the defendant's filing here are surveys from the State of Montana from 2006 and 2008. The 2008 winter survey indicates that they have a record count of elk in the area that's 14% above the previous record high in 2006, and those figures are both above the objectives for the hunting district as seen by the State of Montana there. The fact that we're talking about the danger to elk from hunters, are we talking about the vegetation on the ground definition as opposed to the coverage definition? I mean, obviously if there's hunters on the ground, is that what we're talking about as the damage, potential damage? Let me try and understand your question. The State of Montana, I'm going to try and respond to your question, and please feel free to redirect me if I'm not answering it completely. Well, I'm trying to figure out, because we have these differing definitions of what the hiding cover actually is or should be. Should it be on the ground or over? I mean, are the hunters hunting on the ground? I mean, is that their danger, and that's why they feel strongly that they need more ground cover? Well, the hiding cover itself is for elk to hide in to avoid hunters. So the idea is that- Is that the reason for it, for hunters, or is it for other reasons as well? In other words, is there a reason why elk to thrive need to be somewhere where they're not so close to civilization that they can be seen, or is it simply because of hunting? Your Honor, I'm not positive, but I believe the biggest predator on elk in the area is hunters. The hunters are on the ground. They're not shooting from the air. That's my understanding, Your Honor. I don't have a record set to confirm that. But the issue is hunting. There is control over hunting as such, right? In other words, hunters can only take so many elk, and somebody makes a decision about how many elk it's safe for the hunters to take. So what difference does it make if the elk can be seen or can't be seen if they can't be shot? Well, I mean, putting aside the issue of whether hunters comply lawfully with all the state regulations about the limit that they're entitled to, I think the difference that it makes is the state has primary management over wildlife species. Even on national forests, it regulates hunting. And so the state has an interest in maintaining a certain number of game species like elk for the benefit of hunters. The hiding cover standard, my understanding is that it helps promote elk, which are big game species. And the state of Montana has said that the elk in this area are well above its population objectives. And, in fact, it's working with local landowners to attempt to provide additional access for hunters to... But aren't the elk also indicator species for big game in general in this forest? They are indicator species, yes. So does that suggest that there are other considerations here other than whether the elk themselves are doing okay? Not necessarily. The reasons for designating management indicator species are, you know, sometimes species are designated because they're indicative of management activities, the Forest Service's management activities, or that they represent a certain habitat. It's not always the case that they are sensitive species that are designated as MIS. Sometimes you have species like the goshawk in various forests that may be sensitive. Their populations may be declining. And they also may be indicative, changes in their populations may be indicative of what the Forest Service is doing. Can I just interject here to focus on what I think is maybe a narrower issue for this panel? What is the irreparable injury factor that's at play here? I came to this argument thinking that the injunction or the stay that this panel would be issuing would stop some kind of activity that would arguably adversely affect either the trees, which I think is what's ultimately at issue, is it not, the timber cutting? That's correct, Your Honor. Okay, so you're saying, well, the elk are just fine, but that presupposes that the trees then are going to be, are the trees going to be cut between now and the time oral argument can be scheduled, or what? That's, it's unclear at this point, but I think what your question is relating to is our argument that the plaintiffs need to relate their allegations of substantive violations of law to some relevant harm that's going to be caused by the timber cutting. Well, the measurement today of how the elk are doing doesn't tell me anything about what the elk are going to do if the cover is reduced below the number called for by the plan. If the Forest Service approval is going to reduce the cover, then how does the fact that the elk are increasing under the current cover help us decide whether or not the adverse impact of what is going to happen when the cover is changed is not going to be harmful to the elk? Well, perhaps to answer your question, I ought to address the merits of the elk claim. Can I ask one other question before you do that? Is there going to be any, is the hunting season over? I don't know the answer to that, Your Honor. Okay. It's usually fall. In other words, if they're hunting in the winter, but there aren't even elk in the winter, right? My understanding of the record is that the elk are not present in this area in the winter. Again, Your Honor, I apologize. I do not know the percentage of that question. If there wasn't hunting and there weren't elk, then in terms of our stay, we wouldn't be very concerned about the elk over the period that we're dealing with right now. Right. We're dealing with, let's say we think we may be able to get this on for a hearing before our merits panel the week of February 1 to 5. So what we're looking at is the potential for irreparable harm between now and then and cutting both ways. I mean, what would be the harm to you if we issued a stay and had a hearing on the merits in February with a plan for an expedited resolution? And conversely, what would be the harm to the plaintiff from not issuing the stay? What kind of activity is going to be going on? To date, the contract has not been awarded. Well, we know that because we have a letter from you that said that you're not awarding it until December 17. Correct. What is that, 18? Okay. So we're pretty sure that you haven't awarded a contract. That's correct. But if we were to, if the stay were to be lifted and we were to award a contract, at this point it's up to the recipient of that contract to determine the pace of operations. The Forest Service at this point can't predict how quickly they would be able to move in and operate. So what's the harm to you if we issued a stay and had a merits hearing in first week in February? Well, as I said, I don't know the pace with which a recipient of a contract could move in, but the decision does authorize winter logging. Okay. So assuming a contract recipient were in a position to mobilize equipment and personnel and move in to log the area, then they would be authorized to do so during the winter. We're talking about a six-week period between now and the first week of February. Right. I understand that. Okay. Let's suppose, for argument's sake, that the elk count, sorry, the elk count, the cover count or cover percentage would come out dramatically higher requirement, fewer trees allowed to be cut if the plaintiffs prevail on that issue. That is that you can't substitute a definition and measurement from the wildlife methodology. You have to use what is called for by the plan definition. And, therefore, in gross terms, if the plaintiffs win, fewer trees would be cut. What is the guarantee that then if we didn't, if there isn't a stay, and even with a February merits hearing, the loggers come in and they start cutting in a week and they proceed apace. And then it turns out that come February, the merits panel is persuaded, an oral argument let us say, or isn't sure and debates for a while and then ultimately concludes at some point that the plaintiffs are right and the logging has to stop. Your irreparable injury argument presupposes that there isn't going to be sufficient logging that it would make any difference. Is that correct? Not necessarily.  I can't assert that as a factor. But I think my point, which maybe you disagree with, but the point I'm making nonetheless is that the harm that they need to demonstrate must be related to some injury specific to them and their claims. So it's not insufficient to come and say, we don't want trees falling. Oh, and by the way, we think you violated standards related to something completely unrelated to trees. Could you talk a little bit about the merits of the elk issue? Yes. What do you think it's a percentage of, first of all? And second of all, could you explain to us how we could possibly figure out, as far as I could tell, this is all a moving target through the government's documents in terms of what is being measured how? Right. I think if you look at the plain language of the plan, it says at least two-thirds of the hiding cover associated with habitat components. It's not talking about maintaining two-thirds of the landscape or two-thirds of a project area. But have you made any attempt to find out what the hiding cover associated with key habitat components over time is? Is there a plan that attempts to measure that in the decision documents and the EA? The supplemental EA talks about effects to key habitat areas for elk. It does not calculate a percentage, but it does discuss, it lists on pages four and five of Exhibit D to defendant intervenors filing. It talks about mitigation that is pertinent to hiding cover around key habitat components, and it serves to maintain hiding cover around key habitat components. One of the key habitat components is forested cover and hiding cover for elk. There are other things, such as moist areas, but that's not really at issue right here in this motion. So to answer your question, there hasn't been a quantitative calculation,  But isn't that the answer, that you didn't do what you're supposed to do? I mean, also, what measure did you use? It appears that you used, well, it's not really clear, but it appears that you at least started with the Montana standard, which deals with cover. And at other points you seem to be talking about some sort of vegetation standard, but it's nothing that seems to be tied back to the definition in the plan. I understand your concern, Your Honor. I want to make two points on that, and I have not let intervenors speak. I realize I'm out of time, and I'd like to answer your question, but I also intended to give them a minute to speak as well. I would direct you first to Exhibit 12, to plaintiff's reply. That's the Helena National Forest Plan. It has a table translating the Forest Service definition of hiding cover to the Montana definition of hiding cover. Our brief demonstrated why we were complying under the Montana definition. Now, if you look at the translation there, it's a linear correspondence. You have, across that table, under the Forest Service definition, intervals of seven points, 56 to 49, to 42, to 35. Each is seven points. Correspondingly, you have intervals of ten points under the Montana definition. So the percentages of reduction are going to be the same under either definition. The second point I want to make is more of a legal one. In the earlier Native Ecosystems Council decision from this court, on pages 961 to 962, 418F3rd, the court said, the question is whether we can reasonably discern from the record whether the Forest Service complied with the plan standard. And the court cited State Farm, the decision by the Supreme Court, holding that courts must uphold a decision of less than ideal clarity if agency's path may be reasonably discerned. I would admit, even though the Forest Service has not spelled out expressly all the arithmetic in its decision document, that that linear correspondence there demonstrates that the standard would still be met. And unless there are any other questions, I recognize I'm out of time. All right, why don't we hear from the interveners briefly. Thank you, Your Honor. This is Ron Upsall for the interveners. Just to touch on the moving target question briefly. Did you get closer to your mic? We're having trouble hearing you. Is this better? Yes. Plaintiffs basically created this controversy in the administrative process. They claimed that the Forest Service didn't comply with the Montana definition. So then the Forest Service said, well, we didn't have to, but regardless, we met the Montana definition. And now plaintiffs are trying to use that explanation to say that there's a moving target, there's conflicting information, but they created the controversy. As far as how much logging would occur, the project is 44,000-acre project area of that 23,000 acres where the wildland-urban interface. And the project is looking at 1,100 acres to be treated. Of that treatment, 300 would be a prescribed burn, which would happen at the earliest in spring or fall. So that's not going to happen. 145 for helicopter. I'm sorry, you said that would be a burn? Prescribed burn of a meadow. Yeah, okay. So when it's under snow, they obviously can't burn that. And you said that won't be until spring or fall. Correct. They wouldn't burn in the summer because of the risk of wildfire would be too high. So that would— What defines spring? I didn't hear you, Your Honor. I'm sorry. What defines spring in Montana? I think it would be subject to local conditions when the snow is melt, but there's still enough moisture in the vegetation that wouldn't be burned. So are we talking, what, May? I think we're probably talking May. What about my question about whether there is any hunting that goes on during this time period? I don't know. I know typically hunting seasons will extend into December throughout the West. I'm not sure specifically— So what about after that? This would be an easily ascertainable fact, no? It would be, yes, Your Honor. I'd be happy to pull up the Montana hunting regs and supplement if that's what you would like. And is it your understanding as well that the hunting cover— that the hiding cover question relates to hunting and that's all it relates to? No. Hiding cover for elk is more than just protection against hunters. It's hiding from hikers. It's hiding from other animals. It's down to places at night. It's more than just hiding from a guy in orange. You were also saying that—and I interrupted you on the burn— is there any other timber removal contemplated that would occur before the burn starts? Of the total 810 acres that would be left after the burn, 145 are helicopter logging, which probably wouldn't happen until the summer, and 230 are hand treatments, which most likely wouldn't happen until later in the season. Basically, we're looking at 435 acres along the roads, the really critical stuff that would be subject to starting sooner. That would all be winter logging. By definition, that season is November 1 to April 30. They couldn't log any later than April 30. Based on local conditions, my understanding is the season probably closes earlier than that because the snow gets too deep. Basically, you're saying a stay would preclude 435 acres along roads? Basically, and those are the 435 acres that really need to be cut to promote the project. So 435 acres out of 2,000. I'm just trying to understand the project. The reason you're doing all this is to prevent wildfires? It's to buy time. It's not even to prevent the fire. The fire is likely to still happen. It's to slow the fire down sufficiently to let the people out. These areas are one road in, one road out, and the traffic jams to get out of an area of a fire that's moving at 1 to 3 miles an hour, which is estimated as what would happen. When is your wildfire season? When is the wildfire season in Montana? Summer. Summer. Can you give us any sense, and I will ask the plaintiffs this as well, it's a very discreet project as I understand it, and I don't have really any sense of how many trees are going to be cut. Not a number, but sort of what percentage of trees in this overall area are going to be cut? Do you have any sense of that? There are some numbers provided in the EA on what would be left, the percentages of timber stand that would be left. Some of the thinning is more significant, but I think we're looking at 50 to 60 percent on average I would estimate, but I would have to look at the numbers. So it's quite substantial, the cutting? It ranges from not much to quite substantial, yes. All right. Well, you've hit your five minutes. Is there anything in particular you want to sum up or add in one sentence or so? I just would like to point the court to some of these historic fires. The Derby Fire of 2006 went from 34,000 acres to 154,000 acres in a day. That's the kind of fire hazard that we're looking at here, and delaying a project for the season that it can be cut puts the project into a whole other fire season. All right. Well, thank you very much. I think that Ms. Smith has three minutes left. Thank you, Your Honor. I'd first like to address the appellee's contention regarding the fact that they believe the elk population is doing well, and this was an issue the Forest Service also appeared to raise in the Native Ecosystems Council before this court, and this court dismissed that contention by saying that if the Forest Service thinks that any provision of the plan is no longer necessary or relevant, then the agency should amend the plan and basically get rid of the standard, instead of discounting its importance in NEPA documents. And so the court squarely addressed that issue, that if the Forest Service thinks that this hiding cover standard isn't necessary to protect elk, then they need to just get rid of the standard instead of... Okay. You made that point. What's the argument with respect to lack of irreparable injury, assuming the schedule Judge Wordlaw pointed out? Well, Your Honor, I believe that interveners just admitted there would be hundreds of acres of logging that could occur this winter, and that logging could range from not very much removal to a very substantial amount of tree removal. And so if the issue here is that we don't know whether or not the Forest Service is in line with the elk hiding cover standard, we don't know if there's currently enough hiding cover, we don't know if there will be after the project. But as a legal matter, Ms. Smith, the standard you have to show is a strong likelihood of success on the merits. And I've been wondering, because I've been reading the papers, whether saying we don't know satisfies that standard. It would seem to me you'd have to say something further, not we don't know, but that they haven't. Your Honor, I believe that that question was answered in this court's Native Ecosystems Council case, where this court found that because the court couldn't tell whether or not the Forest Service was complying, that that itself was a violation. Well, he just gave us a basis, the government gave us a basis for linear correlation. What's wrong with that? Your Honor, what's wrong with that is that that's a post hoc rationalization that was created in litigation that was never- That may be post hoc, but does it work? In other words, does it translate? You're arguing that they didn't use the right definition. The assumption is that that will produce a more lenient cutting allowance, but his argument is no, it won't. It's going to come out with the same percentage of protection as the Montana standard. Your Honor, that's- The Montana standard will be equal to the plan standard in ultimate result. Your Honor, without reviewing the calculations behind that comparison in the Helena National Forest, I can't provide an answer as to what- One thing is that the calculation in the Helena National Forest is not in the record in this case. Is that right? I'm sorry, what? It was not assessed or analyzed by the Forest Service in any of their- And it doesn't appear at all in the record in this case. It happened to appear because you attached it. I mean, the administrative record. That's correct, Your Honor. But ultimately, really, whether his analysis works kind of depends on this answer, the question that I started out with, which is 67% of what? And there seems to be a fundamental difference. Because I understood what he was saying as well. In the Helena National Forest, it was a percentage of a land area, and that's why the difference mattered. But here, it's not a percentage of a land area. It's essentially a percentage of a percentage. That is, as long as they're not decreasing the percentage more than what percentage it is historically. So that is a different calculation, and it's why his notion could work, at least conceptually. But you seem to disagree and say it is a percentage of an area. Yes, Your Honor, because that is how the agency presented this standard in the environmental assessments and decision notices. That's how this standard was presented to the public. That's what the public commented on. And that's what the district court decided its initial decision on was whether or not the Forest Service had met this 67%. Well, it's very unclear what the- I mean, I have right in front of me now the district court's opinion, and it really is not-he never says what he thinks the percentage is up. But whatever he thinks it is, he ends up with this analysis where he says the bottom range is 70%, and a 1% reduction in each of these structural classes would go to 67%. What's wrong with that? Well, Your Honor, the first thing that's wrong with that is that he was using a figure of 70% elk hiding cover, which is now not what the agency is arguing is the hiding cover. And the 70% figure was actually the figure for how much vegetation there was in total. It was never a hiding cover estimation at all. And so the district court made a clear mistake of fact by using that 70% number as the hiding cover percentage. And so now the agency says in briefing that they have 62% hiding cover. And so if the district court had been presented with that 62%, then it would not have met that 67% requirement. And there's just varying parameters throughout the record of how to calculate hiding cover, varying estimates of hiding cover, and that's why the appellants believe that this case is controlled by the conclusion in the Native Ecosystems Council case. But Native Ecosystems was really not about a difference in definitions. It was about land areas or something else. Right. It was essentially about the Forest Service developed varying – essentially it is the same because in that case the Forest Service had different explanations for how it was interpreting what its forest plan standard meant. It was basically saying we can use this as the denominator or this as the denominator, but it was the same as the rule. Okay. Well, we can take a look at that case here. Can I ask one last question, which is do you agree that the hiding cover – is the hiding cover point essentially about hunting or about something else? Your Honor, I believe it's about hunting and security and other ways, too, from other predators. I think it's also, as one of the judges pointed out, it's also important for other wildlife species besides elk, who might be subjected to other predators as well as hunting. And so it's important for all kinds of breeding issues. It's not just hunting, and it's not just relevant during hunting season because once those trees are removed, they could take hundreds of years to grow back. And so it will have an effect. Even if it's only about hunting, it will have an effect in future years during hunting season because those trees are not going to grow back. All right. Well, thank you.
judges: Wardlaw, Fisher, Berzon